**IN THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF UTAH
CENTRAL DIVISION**

| | |
|---|---|
| MICHAEL POLK,<br><br>             Plaintiff,<br><br>v.<br><br>TOM PATTERSON et al.,<br><br>             Defendants. | **MEMORANDUM DECISION<br>AND ORDER**<br><br>Case No. 2:07-CV-980 TC<br><br>District Judge Tena Campbell |

Plaintiff, Michael S. Polk, an inmate at the Utah State Prison, filed this *pro se* civil rights

suit under 42 U.S.C. § 1983. *See* 42 U.S.C.A. § 1983 (West 2010). Plaintiff was allowed to

proceed *in forma pauperis* under 28 U.S.C. § 1915. *See* 28 U.S.C.A. § 1915 (West 2010). On

January 13, 2010, as instructed by the court, Plaintiff filed a second Amended Complaint (Dkt.

No. 37) curing the deficiencies in his original pleadings. On June 24, 2010, Defendants filed a

*Martinez* Report (Dkt. No. 50) addressing Plaintiff's allegations. Several months later,

Defendants filed the present motion for summary judgment based on the evidence presented in

their *Martinez* Report. Defendants' Motion for Summary Judgment is now fully briefed and

properly before the court.

## ANALYSIS

### I. Introduction

Plaintiff is an inmate in the custody of the Utah Department of Corrections (UDC).

Plaintiff asserts that UDC officials violated his rights under the First and Fourteenth

Amendments by prohibiting him from having items necessary for the practice of his religion Odinism (also known as Asatru), including: a religions book ("Edda"), a non-synthetic religious symbol ("Thorshammer"), wooden runes, a wooden bowli, a meadhorn, an altar cloth, a meditation drum ("Seidhr"), a rune staff ("Gandr"), an oath ring, a Sahs Sword, fruit juice, pork and fast boxes. Plaintiff also asserts an equal protection claim based on Defendants' provision to inmates of other religions certain accommodations that are allegedly denied to Asatru adherents. Plaintiff seeks declaratory and injunctive relief, compensatory and punitive damages, attorneys fees and costs.

## II.  Summary Judgement Standard

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses." *Cellotex v. Catrett*, 477 U.S. 317, 324 (1986).

The party moving for summary judgment bears the initial burden of showing "that there is an absence of evidence to support the non-moving party's case." *Cellotex*, 477 U.S. at 325. This burden may be met merely by identifying portions of the record which show an absence of evidence to support an essential element of the opposing party's case. *Johnson v. City of Bountiful*, 996 F. Supp 1100, 1102 (D. Utah 1998). Once the moving party satisfies its initial burden "the burden then shifts to the nonmoving party to make a showing sufficient to establish that there is a genuine issue of material fact regarding the existence of [the disputed] element." *Id.* A fact in dispute is "material" only if it might affect the outcome of the suit under governing

law.  *Allen v. Muskogee*, 119 F.3d 837, 839 (10th Cir. 1997).  The dispute is "genuine" if the

evidence is such that it might lead a reasonable jury to return a verdict for the non-moving party.

*Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).

A nonmovant who "would bear the burden of persuasion at trial" must "go beyond the

pleadings and 'set forth specific facts' that would be admissible in evidence in the event of a trial

from which a rational trier of fact could find for the nonmovant."  *Adler v. Wal-Mart Stores*, 144

F.3d 664, 671 (10th Cir. 1998).  Mere allegations and references to the pleadings will not suffice,

instead, the specific facts put forth by the nonmovant "must be identified by reference to an

affidavit, a deposition transcript or a specific exhibit incorporated therein."  *Thomas v. Wichita*

*Coca-Cola Bottling*, 968 F.2d 1022, 1024 (10th Cir. 1992).  Moreover, "the nonmovant's

affidavits must be based upon personal knowledge and set forth facts that would be admissible in

evidence; conclusory and self-serving affidavits are not sufficient."  *Hall v. Bellmon*, 935 F.2d

1106, 1111 (10th Cir. 1991).  The court must "examine the factual record and reasonable

inferences therefrom in the light most favorable to the party opposing the motion."  *Lopez v.*

*LeMaster*, 172 F.3d 756, 759 (10th Cir. 1999).

### III.  Material Facts[1]

1.  Plaintiff, Michael S. Polk, is an inmate in the custody of the Utah Department of

---

[1]  The material facts presented here are drawn from Defendants' Memorandum in Support of Motion for Summary Judgment (Dkt. No. 61).  Plaintiff has not directly responded to Defendants' statement of material facts, however, Plaintiff's opposition brief does identify what Plaintiff asserts are five "genuine issues" remaining for trial.  Although Plaintiff presents some additional "material facts" related to each of these five issues, as discussed in more detail below, they are not properly supported by admissible evidence as required under Rule 56(c).

Corrections ("UDC").

2. Since commitment to UDC custody in November 2005, Plaintiff has been housed at UDC prisons in Draper and Gunnison, Utah, except for stays in the medical infirmary and county jails. While at the Utah State Prison (USP) in Draper, Plaintiff has been housed primarily in the Uinta housing unit, a maximum security facility, and the Oquirrh housing unit, a medium to high security facility. (Offender Location History, *Martinez* Report Ex. 12, Doc. 53-1.)

3. Since 1999, Plaintiff has been involved in twenty-two disciplinary actions and found guilty of numerous violations.

4. Since approximately January 8, 2009, Plaintiff has been housed in the Oquirrh housing unit, a medium to high security facility at USP. (Offender Location History, Doc. 53-1.)

5. Plaintiff is an adherent of the Asatru /Odinism religion. (Am. Compl. ¶ 9.)

6. Odinism, or Asatru, is an ancient, Nordic paganism from pre-Christian Germanic culture and based on Norse mythology and mysticism.[2]

7. Odinism is associated with a Nordic racialist ideology. The Odinist movement has been described as "a spiritual rediscovery of the Aryan ancestral gods . . . intended to embed the white races in a sacred world view that supports their tribal feeling." http://en.wikipedia.org/wiki/Germanic_Neopaganism#Odinism

8. Adherents of Odinism strive to attain the "Nine Noble Virtues," which are described

---

[2] Incarcerated Odinists occasionally interchange the names of their religion between Odinism, Asatru, Wotan, and Wiccan. U.S. Department of Justice, Federal Bureau of Prisons, Inmate Religious Beliefs and Practices, Odinism/Asatru 11 (2002), http://www.nicic.org/pubs/2002/017613.pdf.

as courage, truth, honor, fidelity, discipline, hospitality, industriousness, self-reliance, and perseverance. To attain these virtues, adherents communicate with the ancient Norse gods and goddesses by studying runes, practicing rites on specified days of the week and observing the major Odinist holidays. *Id*.

9. In Norse mythology, the runic alphabet has a divine origin and some Odinists use the runes as a tool for divination, seeking to foresee the future or to be inspired by a god. Other Odinists use runes in identifying powers available for growth, protection, and healing. *Id*.

10. Odinism's two main rituals are the Blot and the Sumbel. On a daily basis, believers honor particular Norse gods, goddesses and ancestors at a small altar with a blessing bowl. A bowli is a sacrificial bowl used to contain mead for the blessing or offering. Blot is the historical Norse term for sacrifice or ritual slaughter and the Norse gods are worshiped by Odinists with a symbolic sacrifice/offering of mead, an alcoholic drink. *Id*.

11. The Edda is a textbook written to develop the techniques of skaldic poetry, using numerous myths as examples. *Id*.

12. A meadhorn is a communal drinking horn used to accept the sacrificial mead by worshipers during a ritual. *Id*.

13. An altar cloth is traditionally used to drape the altar. *Id*.

14. Seidhr: Seid is a type of prophecy or witchcraft, the latter having aspects of prophesy and shamanism. It is not a common ritual but may be related to alterations of consciousness and negotiations with otherworld beings. http://en.wikipedia.org/wiki/Asatru

15. A Gandr is a wooden staff with the runic alphabet written or carved upon it. It

represents the spear of Odin.

16.   An oath ring is a congregate religious item, approximately six inches in diameter, which is used only during worship services and religious programs.  It is used by those who wish to make a sacred oath during group rituals.  *Id*.

17.   A Sahs sword is used for the swearing of holy oaths and used during the Tyr blot in the community.  *Id*.

18.   Odinists may use a variety of personal items in practicing their religion, including a Thorshammer medallion and chain, which is an object of protection, fertility, and new life. http://en.wikipedia.org/wiki/Germanic_Neopaganism#Odinism

19.   UDC staff members have observed deadly weapons made from metal objects in the 2-2.5 inch range with diameters between 1/8 and 1/2 inch.  They have also seen wood in the 2.5 x 1/2 inch range ground and sharpened into a stabbing type deadly weapon.  (Anderson Decl. ¶ 5, Doc. 50-1.)

20.   Hard plastic objects such as pens and toothbrushes have been used as weapons. (Balls Decl. ¶ 3, Doc. 50-2.)

21.   In one incident, Plaintiff was found to have hidden a sharpened spork and numerous jewelry items made from destroyed jail property while temporarily housed at the Cache County jail in 2006.  (Offender Discipline History, Incident 208485, *Martinez* Report Ex. 13, Doc. 53-2.)

22.   Plaintiff is allowed to wear a Thorshammer, which in maximum security must be made of plastic.  (Koehler Decl. ¶ 3, Doc. 50-4; Balls Decl. ¶¶ 3, 4, Doc. 50-2.)

23.   UDC staff have never seen a gold wedding band converted into a deadly weapon, or

any kind of weapon at USP.  (Anderson Decl. ¶ 5, Doc. 50-1.)

24.   Wooden items such as runes or bowls are not allowed in the prison for security reasons.  UDC staff have observed USP inmates using pieces of wood on at least four occasions to disable or circumvent door locks.  (Balls Decl. ¶ 5, Doc. 50-2.)

25.   This has been done to make the doors appear to be locked so as to set a trap for an officer.  (Burr Decl. ¶ 5, Doc. 50-3.)

26.   Plastic bowls are available for purchase by inmates through the prison commissary. (UCI commissary list, Doc. 50-12 at 7.)

27.   Metal objects are not allowed in Uinta 1 (maximum security).  (Anderson Decl. ¶¶ 4, 5, Doc. 50-1.)

28.   UDC has a staff of approximately 120 UDC employees who oversee and implement a variety of programs, including inmate treatment, education, technical training and religious practices.  (Burr Decl. ¶ 3, Doc. 50-3.)

29.   Staff members at USP manage inmates under UDC policy FDr 20, "Privilege Level System," whose stated rationale is to "manage inmates in a manner which optimally promotes institution safety, security, management and control."  (UDC Policy FDr 20, Doc. 50-7.)

30.   Prison policies for inmate property and religious items vary according to security levels of the housing unit and the inmate's privilege level.  (UDC Policy FDr20, Doc. 50-7.)

31.   The Inmate Property Matrix sets forth the types and amounts of personal property an inmate may possess at USP, depending on the inmate's security level.  (FDr14/12.00, Doc. 50-8 at 75-88.)

32.  Staff members at USP control inmate property under UDC policy FDr 14, "Inmate Property." (Doc. 50-8.)  Under that policy, inmates are allowed to have "one approved religious symbol in their possession."  The symbol must comply with the Inmate Property Matrix, with certain exceptions, including Native American eagle feather, prayer beads, rosary beads (plastic only), and neck chain (one only).  This policy also sets forth the methods, including request for approval for purchase, by which inmates can obtain a religious symbol.  (FDr14/02.11E.1, Doc. 50-8 at 31.)

33.  Prison policy allows inmates one approved religious medallion, which can be a plastic Thorshammer.  (FDr 14/02/10, Doc. 50-8 at 30.)

34.  In maximum security housing (Uinta), a metal Thorshammer or similar item is banned because it can be fashioned into a tool that could be used, for example, to unlock handcuffs.  (Burr Decl. ¶ 4, Doc. 50-3.)

35.  USP policy allows inmates to possess rune cards of a size and material similar to playing cards.  (Koehler Decl. ¶ 9, Doc. 50-4.)

36.  Fruit juice is not given to inmates at USP because it can be fermented to create alcohol, which is forbidden.  USP officers have discovered alcohol numerous times in inmates' sinks and toilets and hidden within inmates' clothing and in the gymnasium, locker areas, and pool tables at USP.  (Balls Decl. ¶ 6, Doc. 50-2.)

37.  A substitute, sugar-free punch is served at lunch.  (Monson Decl. ¶ 3, Doc. 50-5.)

38.  Pork meats/products are not served in meals provided to inmates at USP because of religious objections from inmates.  (Balls Decl. ¶ 7, Doc. 50-2; Monson Decl. ¶ 4, Doc. 50-5.)

39. Pork products, such as fully cooked bacon and pork ramen, are available for purchase through the commissary. (Monson Decl. ¶ 6, Doc. 50-5; UCI Commissary list, Doc. 50-15 at 3.)

40. A fabric item such as a towel is available for purchase by inmates through the commissary, and can be used by inmates as a prayer rug, altar cloth or for similar purposes. (Koehler Decl. ¶ 9, Doc. 50-4; UCI Commissary list, Doc. 50-15 at 7.)

41. Inmates are allowed by UDC policy to have up to ten books, unless in intensive management for behavioral or other security issues. Hard-backed books are not allowed in maximum security. (Talbot Decl. ¶ 4, Doc. 50-6; Inmate Property Matrix, Doc. 50-8 at 77.)

42. USP inmates who wish to fast during the day are provided "break-the-fast" food boxes upon forty-five days written notice. (Koehler Decl. ¶ 10, Doc. 50-4; Monson Decl. ¶ 5, Doc. 50-5.)

43. Plaintiff was on the list of inmates to receive break-the-fast boxes for Sigrblot in April 2010, but was not on the list for receipt of a box for the Summer Solstice in June 2010. (Koehler Suppl. Decl. ¶ 9, Doc. 58.)

## IV. Legal Standard for Prisoner Free Exercise Claims

It is well established that "convicted prisoners do not forfeit all constitutional protections by reason of their conviction and confinement in prison." *Bell v. Wolfish*, 441 U.S. 520, 545 (1979). "Inmates clearly retain protections afforded by the First Amendment, *Pell v. Procunier*, 417 U.S. 817, 822, 94 S. Ct. 2800, 2804 (1974), including its directive that no law shall prohibit the free exercise of religion." *Id.* However, it is also well established that "[l]awful incarceration brings about the necessary withdrawal or limitation of many privileges and rights, a retraction

justified by the considerations underlying our penal system." *Id*. "[L]imitations on the exercise of constitutional rights arise both from the fact of incarceration and from valid penological objectives, including deterrence of crime, rehabilitation of prisoners, and institutional security." *O'Lone v. Estate of Shabazz*, 482 U.S. 342, 348 (1987).

In *Turner v. Safley*, 482 U.S. 78 (1987), the Supreme Court established the framework for evaluating the validity of prison regulations that restrict inmates' free exercise rights. Under *Turner*, such restrictions may be upheld only if they are "reasonably related" to legitimate penological interests. *Id*. at 89. The *Turner* court identified four factors relevant to the reasonableness determination, which the Tenth Circuit has summarized as follows:

> First, the court considers whether there is a logical connection between the prison regulation and the asserted penological interest. Second, the court considers whether alternative means of exercising the religious right in question remain open to inmates. Third, the court assesses the impact the accommodation of the right in question would have on guards, other inmates, and on the allocation of prison resources. Fourth, the court considers whether any policy alternatives exist that would accommodate the right in question at de minimis cost to the prison.

*Hammons v. Saffle*, 348 F.3d 1250, 1255 (10th Cir. 2003) (internal citations omitted).

In applying *Turner's* "reasonable basis" test, courts must give appropriate deference to the expertise of prison authorities. *Turner*, 482 U.S. at 84. But "a reasonableness standard is not toothless" and deference is not a rubber stamp; thus, before acceding to the judgment and discretion of prison administrators, a court should have evidence that their judgment and discretion have been exercised. *Abbott v. Thornburgh*, 490 U.S. 401, 414 (1989). Because the reasonable basis test is designed to allow prison administrators to "anticipate security problems," officials can establish a valid, rational connection based on their past experience and intimate

knowledge of institutional safety concerns. An asserted justification must be accepted unless it is "so remote as to render the regulation arbitrary or irrational." *Turner*, 482 U.S. at 89. "[T]he absence of ready alternatives is evidence of the reasonableness of a prison regulation . . . [while] the existence of obvious, easy alternatives may be evidence that the regulation is not reasonable, but is an 'exaggerated response' to prison concerns." *Turner*, 482 U.S. at 89-91.

### V. Sufficiency of Plaintiff's First Amendment Claims

In accordance with *Turner*, the court must decide whether the limitations placed on Plaintiff's religious exercise are reasonably related to legitimate penological interests. Each of Plaintiff's requested accommodations are addressed in turn.

### A. Edda

Plaintiff alleges that Defendants violated his First Amendment rights by not providing him a copy of the Edda, Odinism's sacred text. Defendants have presented ample evidence showing that Plaintiff is not prohibited from having a copy of the Edda for his personal use and that the Edda is available for purchase through the prison commissary. Moreover, prison regulations also permit anyone outside the prison to donate a copy of the Edda to the prison for inmate use via the Volunteer and Religious Services Department. Finally, the prison chaplain may also provide a book to an inmate upon his or her request or may place a book in the inmate library. (Koehler Supp. Decl. ¶¶ 3-5.)

Plaintiff has not presented any evidence to support his claim that he was prevented from having a copy of the Edda. The record shows that there are numerous avenues available for Plaintiff to obtain a copy of the Edda, and that he is permitted to have a copy in his cell for

11

personal use. Moreover, Plaintiff has not presented any legal support for his contention that prison officials have an affirmative obligation to provide inmates with religious literature of their choosing, free of charge. In fact, were they to do so they would undoubtedly be accused of violating the establishment clause. Thus, the court finds that Plaintiff's First Amendment right to freely exercise his religion was not violated by Defendants' failure to provide Plaintiff with a copy of the Edda.

## B.  Thorshammer Medallion

Plaintiff complains that he is not permitted to have a Thorshammer made of a natural substance, such as wood or metal, but is only allowed to have a plastic one. Plaintiff asserts that the Thorshammer "must be made from substances of the Earth" because it "is worn by Odinists for protection from the chaos one encounters as it gives the wearer the strength of the Earth." (Am. Compl. at 3-4.) Defendants assert that a wood or metal Thorshammer would present much greater safety and security risks than plastic. Defendants also contend that wearing a plastic Thorshammer rather than one made of a natural substance is merely an inconvenience which is justified by legitimate safety and security concerns.

Although Defendants have not presented any evidence to contradict Plaintiff's assertion that a Thorshammer should ideally be made from a natural substance, Defendants have provided ample evidence that a non-plastic Thorshammer would substantially jeopardize institutional safety and security. According to the declarations of prison officials, small metal objects about the size of a Thorshammer medallion have often been crafted by inmates into weapons. (Balls Decl. ¶ 3.) Such objects have also been used to unlock handcuffs and to scratch plastic cell-door

windows in order to obscure officers' visibility.  (Burr Decl. ¶ 4; Talbot Decl. ¶ 3.)   Moreover, as discussed in more detail below, wooden objects are not permitted in maximum security units because they can easily be fashioned into weapons or used to circumvent locks.  (Burr Decl. ¶ 5.)

Plaintiff's only evidence contradicting Defendants' arguments for prohibiting non-plastic Thorshammers is his sworn Declaration stating that other wood and metal objects are, in fact, available in the prison.  Plaintiff states that wood and metal pieces can easily be scavenged from furniture and fixtures within the prison.  (Polk Decl. ¶ 5.)  Plaintiff also states that various games allowed in the prison, such as Scrabble, Monopoly, dominoes and cribbage, include wood and metal pieces similar in size to a Thorshammer medallion.  (Polk Decl. ¶ 7.)  Finally, Plaintiff states that he has personally seen throughout the prison other inmates with metal chains, crucifixes, St. Christopher medallions and Islamic pendants.  (Polk Decl. ¶ 6.)

Consideration of the *Turner* factors shows that the prison's ban on non-plastic Thorshammers is reasonably related to legitimate penological interests.  First, Defendants have clearly shown a logical connection between the ban and the asserted penological interest in safety and security.  Although Plaintiff states that wood and metal objects can be obtained elsewhere, he does not dispute that they present legitimate security concerns.  In addition, Plaintiff's statement that he has seen other inmates with metal religious items is unavailing because those items may have been contraband.  Plaintiff has not shown that such items are permitted under prison policies or that prison officials intentionally turn a blind eye to such items.  Second, Defendants have provided a reasonable alternative by permitting Plaintiff to have a Thorshammer made of plastic.  While this accommodation may not be ideal, and may even curtail Plaintiff's religious

exercise to some degree, it clearly offers an alternative means of exercising the right in question. Third, Defendants have shown that allowing Plaintiff to have a non-plastic Thorshammer would have a substantial impact on prison safety and security by increasing the availability of materials for producing dangerous weapons and other contraband. Finally, Plaintiff has not shown that there are any alternatives besides plastic that would better accommodate his needs while having only a de minimis impact on safety and security.

Thus, the court concludes that the ban on non-plastic Thorshammers is reasonably related to legitimate safety and security concerns and does not violate Plaintiff's Free Exercise rights.

### C.  Wooden Runes, Bowli, Seidhr, Gandr and Oath Ring

Plaintiff alleges that he is being denied various wooden items that are important to his religious exercise, including a set of runes, a bowli (bowl), a Seidhr (meditation drum), a Gandr (rune staff), and an oath ring. Plaintiff states that the runes and bowli are important to his individual worship while the other items are necessary for group ceremonies.

Defendants state that wooden items are not permitted within the prison because they present serious safety and security concerns. According to the declarations of prison officials, small wood pieces have been used to jam cell doors and circumvent locking mechanisms. Officer Balls states that he observed this happen on numerous occasions, which precipitated the removal of wood from the craft area. (Balls Decl. ¶ 5.) Officer Burr also states that he has seen an inmate use wood pieces to jam a mechanical lock so that it appeared to be secure, in order to set a trap for an officer. (Burr Decl. ¶ 5.) Officer Burr further states that wooden broom handles are no longer used in the prison because they have been sharpened and used to stab another

inmate in the eye.  (Burr Decl. ¶ 5.)

Due to the ban on wooden items, the prison has followed the lead of other institutions by allowing inmates to possess a set of rune cards, similar to playing cards, rather than wooden rune sets.[3]  The substitution of rune cards for wooden runes has been upheld by other courts.  In *Keen v. Noble*, 2007 WL 1080549, at *1 (E.D. Cal. Apr. 04, 2007), an inmate alleged that being denied personal possession of rune stones violated his free exercise rights.  The court held that the denial was based on legitimate security concerns and that rune cards were a suitable accommodation. Similarly, Defendants state that Plaintiff has access to plastic bowl through the commissary which can be used in lieu of a wooden bowli.  Although Plaintiff contends that plastic bowls and rune cards are not suitable alternatives to wooden runes and bowli, he has not proffered any evidence to support this contention.  Nor has Plaintiff cited any legal authority holding that these alternatives violate the First Amendment.

Regarding the other wood items sought by Plaintiff, Defendants state that a wooden drum, staff, and oath ring would be permitted for group worship services if provided by an outside volunteer, subject to obtaining the necessary clearances from the Security and Housing Department, the Warden, and the Programming Deputy Warden.  (Koehler Suppl. Decl. ¶ 6.) Once approved, these items would either be stored in a secure location at the prison, such as the chapel, or else the volunteer would be required to bring the items to the prison for each visit.

---

[3]  "A wood rune is about the size of a quarter, and a rune card is approximately the size of a regular playing card.  Runes consist of a series of symbols that form a non-traditional alphabet used by practitioners of Odinism."  *Borzych v. Frank*, 2010 WL 1026977, at *3 (W.D. Wis. Mar. 17, 2010).

(Koehler Suppl. Decl. ¶ 7.)  Plaintiff cannot have a wooden drum in his personal possession because, in addition to the ban on wooden items, inmates are not permitted to have musical instruments in their cells.  (Koehler Suppl. Decl. ¶ 8.)

Again, the court finds that the restrictions on wooden religious items are reasonably related to legitimate penological interests, as required under *Turner*.  Defendants have not only shown that the restrictions bear a logical connection to valid safety and security concerns, but also that reasonable alternatives have been provided where possible.  In addition, Plaintiff has not contradicted Defendants' evidence that additional accommodations would negatively affect prison operations; nor has Plaintiff shown that other alternatives are readily available at *de minimis* cost to the prison.  Thus, the court concludes that UDC's restrictions regarding wooden runes, bowli, meditation drums, rune staffs, and oath rings are reasonably related to legitimate safety and security concerns and do not violate Plaintiff's rights under the free exercise clause.

### D.  Meadhorn, Sahs Sword, Altar Cloth

Plaintiff's Amended Complaint lists a meadhorn, Sahs Sword and altar cloth as additional items necessary for his religious worship that have been denied by prison officials.   Plaintiff states that the "meadhorn is used in rituals and [is] historically one of the most sacred items in Odinism."  (Am. Compl. at 4.)  Plaintiff does not provide any additional details about the meadhorn or specifics about how it is necessary for his religious observance.  Defendants have presented facts showing that the meadhorn is a communal drinking horn used to accept the sacrificial mead, an alcoholic beverage, during group rituals.  Not only is alcohol prohibited in the prison but fruit juice is also unavailable because it can be fermented to produce alcohol.

(Balls Decl. ¶ 6.)  Given the prohibition on alcohol, Defendants assert that Plaintiff has not

presented sufficient evidence that denial of a meadhorn violates Plaintiff's religious rights.

The court agrees.  Aside from his terse statement about the sacredness of the meadhorn,

Plaintiff has not presented any evidence showing that it is necessary for his religious practice, or

that its use can be accommodated within the prison setting.  Although Plaintiff challenges

Defendants' assertions regarding the availability of fruit juice in the prison, he does not deny that

alcohol is strictly forbidden for valid penological reasons.  Thus, Plaintiff's evidence regarding

denial of a meadhorn is insufficient to survive summary judgment.

Plaintiff alleges that the Sahs Sword is used to swear oaths during rituals and "can be a 22

x 2 inch piece of cardboard with runes written on the outside."  (Am. Compl. at 4.)  Defendants

state that even a cardboard Sahs Sword cannot be permitted in Plaintiff's cell because inmates are

not permitted to have cardboard.  Defendants have presented testimony showing that cardboard

can be used to disable or circumvent a cell door's locking mechanism and that inmates have

hidden contraband inside corrugated cardboard.  (Koehler Supp. Decl. ¶ 11.)  Defendants

conceded, however, that a cardboard Sahs Sword could be allowed in group worship if approved

through proper channels and stored securely.  (Koelher Supp. Decl. ¶¶ 6-7.)  Plaintiff does not

dispute Defendants' assertions regarding the dangers of allowing inmates to have cardboard, nor

does he contend that permitting a cardboard Sahs Sword only during group worship is an

unreasonable alternative.  Thus, Defendants are entitled to summary judgment on this claim.

Finally, Plaintiff alleges that he was denied an altar cloth which he describes as an "18 x

18 inch natural fabric cloth that has many significant values and uses."  (Am. Compl. at 4.)

According to Defendants, the altar cloth, as its name suggests, is used to drape the altar during religious ceremonies. Even accepting Plaintiff's vague assertion that the altar cloth is integral to his religious exercise, the record shows that Plaintiff has a ready alternative in the form of an extra towel that can be purchased through the prison commissary. (Koehler Decl. ¶ 9.) Officer Koehler also states that "Plaintiff has the option of purchasing a prayer/alter [sic] cloth from a vendor or having a prayer/alter [sic] cloth sent to him through the Prison Property Unit." (Koehler Decl. ¶ 4.) Plaintiff not only fails to show the importance of the altar cloth to his religious worship, but he has also failed to refute Defendants' evidence regarding the availability of altar cloths or suitable alternatives. Thus, Plaintiff cannot make out a free exercise claim based on the alleged denial of an altar cloth.

### E. Conclusion

The evidence here does not support the conclusion that Plaintiff's First Amendment rights were violated based on the denial of items necessary to exercise his religion. Instead, with regard to each of the items identified by Plaintiff, the record shows that a valid, rational connection exists between the restrictions on Plaintiff's religious exercise and the promotion of institutional safety and security. Plaintiff has not shown that the safety and security concerns cited by Defendants are so remote as to render the challenged regulations arbitrary or irrational. Moreover, Defendants have shown that wherever possible Plaintiff has been afforded reasonable alternatives for exercising the rights in question. Thus, Defendants are entitled to summary judgment on Plaintiff's free exercise claims.

### VI. Due Process Claim

Plaintiff's Amended Complaint asserts a due process claim under the Fourteenth Amendment based on the denial of the nine religious items previously discussed. Plaintiff contends that he was denied due process when his requests for these items were rejected without prior notification or a hearing.

The Fourteenth Amendment's procedural due process guarantee "ensures that a state will not deprive a person of life, liberty or property unless fair procedures are used in making that decision." *Kirkland v. St. Vrain Valley Sch. Dist.*, 464 F.3d 1182, 1189 (10th Cir. 2006). To make out a procedural due process claim, a plaintiff must show: (1) that he has a constitutionally protected liberty or property interest that has been interfered with by the state; and, (2) that he was not afforded an appropriate level of process. *Couture v. Board of Educ. of Albuquerque Pub. Sch.*, 535 F.3d 1243, 1256 (10th Cir. 2008). The Supreme Court has recognized that in the prison context "states may under certain circumstances create liberty interests which are protected by the Due Process Clause." *Sandin v. Conner*, 515 U.S. 472, 483 (1995). However, "a deprivation occasioned by prison conditions or a prison regulation does not reach protected liberty interest status and require procedural due process protection unless it imposes an 'atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life.'" *Steffey v. Orman*, 461 F.3d 1218, 1221 (10th Cir. 2006) (quoting *Sandin*, 515 U.S. at 484).

Here, Plaintiff cannot show that the denial of his requested religious items amounted to an atypical and significant hardship in relation to the ordinary incidents of prison life because, as previously explained, the denials were reasonably related to legitimate penological interests. Plaintiff clearly does not have a liberty interest in possessing items which are validly prohibited

by prison regulations designed to ensure institutional safety or security items. This is true regardless of the items' religious nature. Because Plaintiff did not have a constitutionally recognized liberty interest in the items, he cannot challenge the procedures used to deny them to him. As other courts have recognized, where a prison deprivation does not implicate protected liberty or property interests "the state is free to use any procedures it chooses, or no procedures at all" when restricting them. *Montgomery v. Anderson*, 262 F.3d 641, 644 (7th Cir. 2001).

Plaintiff's due process claim also fails because he had ample opportunity to challenge the denial of his religious items through the prison grievance process. The Supreme Court has held that where a pre-deprivation process is impractical, due process can be satisfied by a meaningful post-deprivation remedy. *Hudson v. Palmer*, 468 U.S. 517, 532-33 (1994). Although prison regulations do not provide for a pre-deprivation hearing before denial of a requested religious item, as such hearings would be impractical, inmates are permitted to challenge such denials through the prison grievance process. Indeed, the record here shows that Plaintiff pursued each of his requests for religious accommodations through the grievance system and received numerous responses from prison officials. (Grievance Records, Doc. No. 50-11.)

Plaintiff's claim that his due process rights were violated when prison officials denied him religious items based on his security classification is also without merit. It is well established that prisoners have no right under the United States Constitution to any specific classification or housing assignment. *See Hewitt v. Helms*, 459 U.S. 460, 468 (1983). Thus, an inmate's classification will implicate a protected liberty interest only where it imposes an "atypical or significant hardship on the inmate in relation to the ordinary incidents of prison life,"

*Sandin*, 515 U.S. at 485, or threatens to lengthen his term of confinement, *id*. at 487.  Plaintiff

has not offered any evidence that his classification satisfies either of these requirements.

Moreover, Defendants have submitted ample evidence showing that Plaintiff's heightened

security classification is justified based on his disciplinary history.  (Offender Discipline History

and Incident Reports, Doc. No. 53-2.)

## VII.  Equal Protection Claim

Plaintiff's Amended Complaint asserts that Defendants violated the Fourteenth

Amendment's equal protection guarantee by favoring other religions over his own.  Specifically,

Plaintiff claims that prison officials allow American Indian inmates and Jewish inmates to have

religious items similar to those denied to Odinist adherents.  (Am. Compl. ¶ 31.)  Plaintiff also

asserts that Defendants provide "break-the-fast" boxes to Islamic inmates, among others, during

Ramadan, but have refused to provide the same to Plaintiff during the Asatru Winter Nights.

(Am. Compl. ¶ 32.)  Finally, Plaintiff alleges that Defendants have refused to provide him fruit

juice and pork for religious celebrations, despite providing special meals to Jewish, Islamic and

vegetarian inmates.

### A.  Legal Standard

The Equal Protection clause requires that "all persons similarly circumstanced shall be

treated alike."  *F.S. Royster Guano Co. v. Virginia*, 253 U.S. 412, 415 (1920).  An equal

protection violation occurs when the government treats someone differently from another person

who is similarly situated, without adequate justification for the difference in treatment.  *City of*

*Cleburne v. Cleburne Living Center*, 473 U.S. 432, 439 (1985); *Jacobs, Visconsi & Jacobs, Co.*

*v. City of Lawrence*, 927 F.2d 1111, 1118 (10th Cir.1991). However, a plaintiff alleging an equal protection violation must present specific facts which demonstrate that a discriminatory purpose was a motivating factor in the decision attacked by the complaint. *Watson v. City of Kansas City, Kan.*, 857 F.2d 690, 694 (10th Cir .1988). "'Discriminatory purpose' . . . implies more than intent as volition or intent as awareness of consequences. It implies that the decision maker . . . selected or reaffirmed a particular course of action at least in part 'because of,' not merely 'in spite of,' its adverse effects upon an identifiable group." *Personnel Adm'r of Mass. v. Feeney*, 442 U.S. 256, 279 (1979).

The Supreme Court has held that "the standard of review adopted in *Turner* applies to all circumstances in which the needs of prison administration implicate constitutional rights." *Washington v. Harper*, 494 U.S. 210, 224 (1990); *see Turner v. Safley*, 482 U.S. 78 (1987). This includes equal protection claims filed by prisoners. *Patel v. Wooten*, 15 Fed. App'x 647, 650 (10th Cir. 2001). Thus, in the prison religious context, equal protection does not require "that every religious sect or group within a prison—however few in numbers—must have identical facilities or personnel." *Cruz v. Beto*, 405 U.S. 319, 322 (1972). Instead, prison officials must only ensure that an inmate of a minority religion enjoys "a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts." *Id*. This standard gives deference to prison administrators to determine which groups will be allowed to operate within the prison population. *Jones v. North Carolina Prisoners' Labor Union, Inc.,* 433 U.S. 119, 136 (1977). When faced with "the decision as to which of many groups should be allowed to operate within the prison walls, where, confronted

22

with claims based on the Equal Protection Clause, the courts should allow the prison administration the full latitude of discretion." *Id.* Nothing in the Constitution requires prison officials to treat all inmate groups alike, particularly when differentiation is necessary to avoid disruption or violence. *Id.*

## B. Sufficiency of Plaintiff's Evidence

The court first addresses Plaintiff's allegation that prison officials have approved religious items for Native American and Jewish inmates while denying similar accommodations to Odinist inmates. (Am. Comp. ¶ 31.) Plaintiff has not presented any evidence to support this assertion besides his sworn statements that "Native Americans have their own piece of land on which they perform their ritual sweats" (Polk Decl. ¶ 12); and that "Jewish, Muslim and vegetarian inmates are given diets consistent with their beliefs at no expense to the inmate." (Polk Decl. ¶ 13.) These unsupported statements are not sufficient to show intentional discrimination, as required to make out an equal protection claim. *See, e.g., Sossamon v. Lone Star State of Tex.*, 560 F.3d 316, 336 (5th Cir. 2009) (holding that bare allegation that Muslim prisoners received religious accommodations where members of other religions did not was no more than "bald, unsupported, conclusional allegations that defendants purposefully discriminated" and was inadequate to support equal protection claim).

Plaintiff's claim that he was denied special meals afforded to inmates of other religions is also unsupported by the record. Plaintiff complains that he did not receive "break-the-fast" boxes for each night of Winter Nights and that such meals are routinely provided to inmates of other religions. (Am. Comp. ¶ 21.) However, the record shows that fast boxes were always

23

available to Plaintiff in accordance with prison policies, which allow inmates to receive fast boxes only if they make a request in writing forty-five days prior to the day they are needed. (Koehler Decl. ¶ 10, Doc. 50-4; Monson Decl. ¶ 5, Doc. 50-5). Plaintiff has not shown that he was denied fast boxes despite following the required procedures; nor has he shown that other inmates are exempt from those procedures. In fact, prison records show that since filing his Complaint, Plaintiff has only intermittently requested fast boxes. For example, Plaintiff was on the list of inmates to receive a box for Sigrblot (an Asatru holy day celebrated in April 2010), but was not on the list of sixty-seven Wicca and Asatru adherents to receive a box for Summer Solstice (in June 2010). (Koehler Suppl. Decl. ¶ 9.) Because the record shows that Plaintiff received the same accommodations as other inmates when he complied with the necessary procedures, Plaintiff's equal protection claim based on the alleged denial of fast boxes fails.

Finally, Plaintiff's claim that he was denied pork and fruit juice for special religious observances is insufficient to show a denial of equal protection. Defendants have presented ample evidence showing that the decision to deny fruit juice to inmates is based on valid security concerns. According to prison officials, inmates have been known to hoard fruit juice, hide it in inconspicuous places such as toilets, and ferment it into an alcoholic beverage for consumption. (Balls Decl. ¶ 6; Burr Decl. ¶ 6.) This contraband alcohol greatly increases the potential for violence and volatility within a prison unit. As an alternative to fruit juice, inmates are allowed sugar-free punch, which is routinely served at lunch time. (Monson Decl. ¶ 3.) Defendants assert that sugar-free punch is a suitable alternative for Plaintiff's religious observance.

Regarding the availability of pork, the record shows that pork products are strictly

24

excluded from inmate meals due to objections from inmates of other religions which prohibit pork. Moreover, providing pork products to only certain inmates is not feasible due to the risks of cross-contamination of meals and kitchen facilities. (Balls Decl. ¶ 7, Doc. 50-2; Monson Decl. ¶ 4, Doc. 50-5.) Prison officials also state that inmates who prepare or distribute prison food have targeted other inmates who receive special dietary accommodations banning pork. (Burr Decl. ¶ 7.) And, inmates have fashioned bones from pork chops into weapons. (Balls Decl. ¶ 7.) As an alternative to receiving pork in their meals, inmates are allowed to purchase some pork products, such as fully cooked bacon and pork ramen, through the commissary. (Monson Decl. ¶ 6, Doc. 50-5; UCI Commissary list, Doc. 50-12 at 3). Defendants assert that Plaintiff can purchase and consume these products from the commissary as a viable alternative for practicing his religion.

Based on the evidence presented, the court concludes that Plaintiff cannot show an equal protection violation based on the denial of pork or fruit juice. The restrictions on these items are amply justified by valid penological concerns, including ensuring institutional safety and meeting the religious dietary needs of all inmates at the prison. Moreover, Defendants are entitled to substantial deference in deciding how best to ensure institutional safety while balancing the competing needs of various religious groups. Plaintiff has not shown that Defendants intentionally disfavored his religion when making dietary decisions. Moreover, Defendants have shown that viable alternatives are available to allow Plaintiff a reasonable opportunity of pursuing his faith comparable to the opportunity afforded fellow prisoners who adhere to conventional religious precepts.

Thus, Defendants are entitled to summary judgment on Plaintiff's equal protection claim.

**ORDER**

Based on the foregoing analysis, **IT IS HEREBY ORDERED** that:

(1) Defendants' Motion for Summary Judgment (Dkt. No. 60) is **GRANTED**;  and,

(2) this case is **CLOSED**.

DATED this 17th day of May, 2011.

BY THE COURT:

_Tena Campbell_
TENA CAMPBELL
United States District Judge